**[ORAL ARGUMENT HELD ON APRIL 20, 2018]**

No. 17-7146

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

ROSALIE SIMON, ET AL.,

Plaintiffs-Appellants,

v.

REPUBLIC OF HUNGARY and MAGYAR ALLAMVASUTAK
ZRT., (MAV ZRT.),

Defendants-Appellees.

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————

**BRIEF FOR AMICUS CURIAE THE UNITED STATES**

————————————

JENNIFER G. NEWSTEAD
*Legal Adviser*

*U.S. Department of State*
*Washington, D.C.  20520*

CHAD A. READLER
*Acting Assistant Attorney*
*General*

MARK B. STERN
SHARON SWINGLE
*(202) 353-2689*
*Attorneys, Appellate Staff*
*Civil Division, Room 7250*
*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C.  20530*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    <u>Parties and Amici</u>.

The plaintiffs-appellants are Rosalie Simon, Magda Kopolovich Bar-Or, Ella Feuerstein Schlanger, Helen Herman, Zehava (Olga) Friedman, Moshe Perel, Charlotte Weiss, Yitzhak Pressburger, Helena Weksberg, Alexander Speiser, Rose Miller, Ze'ev Tibi Ram, Estate of Tzvi Zelikovitch, and Estate of Vera Deutsch Danos.  The defendants-appellees are the Republic of Hungary and Magyar Allamvasutak Zrt.  Amicus curiae is the United States of America.

### B.    <u>Rulings Under Review</u>.

The ruling under review is the district court's September 30, 2017 order dismissing the action without prejudice, for the reasons set forth in the accompanying memorandum opinion.  The decision is published at 277 F. Supp. 3d 42 (D.D.C. 2017), and is reprinted at Joint Appendix 268-304.

### C.    <u>Related Cases</u>.

This case was previously before the Court.  *See Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016).  There appear to be no related cases within the meaning of D.C. Circuit Rule 28(a)(C).  However, there are a number of other cases raising similar legal issues, including *Fischer v. Magyar Allamvasutak*

*Zrt.*, 777 F.3d 847 (7th Cir. 2015), *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661

(7th Cir. 2012), and *Philipp v. Federal Republic of Germany*, 248 F. Supp. 3d 59

(D.D.C.), *appeal docketed*, No. 17-7117 (D.C. Cir. 2017).

 /s/ Sharon Swingle
Sharon Swingle

# TABLE OF CONTENTS

Glossary

Interest of Amicus Curiae .....................................................................1

Statement of the Issues.........................................................................1

Pertinent Statutes and Regulations.......................................................2

Statement of Facts ................................................................................2

     A.    Factual Background.......................................................2

     B.    Procedural Background. ................................................4

ARGUMENT ........................................................................................9

A DISTRICT COURT MAY DISMISS CLAIMS UNDER THE FSIA'S EXPROPRIATION EXCEPTION IN DEFERENCE TO AN ALTERNATIVE FORUM UNDER THE DOCTRINES OF INTERNATIONAL COMITY AND FORUM NON CONVENIENS..........9

     A.    A District Court May Dismiss A Case Brought Under The FSIA's Expropriation Exception In Deference To An Alternative Forum As A Matter Of International Comity. .......14

     B.    A District Court May Also Abstain From Exercising Jurisdiction Under The FSIA Under The Forum Non Conveniens Doctrine................................................................25

# TABLE OF AUTHORITIES

## *Cases*

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n*,
    528 U.S. 934 (D.C. Cir. 2008)......................................................18

*American Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) ......................................18

*de Csepel v. Republic of Hungary*, 169 F. Supp. 3d 143 (D.D.C. 2016)................20

*de Csepel v. Republic of Hungary*, 859 F.3d 1094 (D.C. Cir. 2017)......................22

*Esfeld v. Costa Crociere, S.P.A.*, 289 F.3d 1300 (11th Cir. 2002)..........................25

*First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759 (1972) ..............13

*Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847 (7th Cir. 2015).....................20

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)......................................................25

*Hilton v. Guyot*, 159 U.S. 113 (1895) .....................................................................13

*Isbrandtsen Tankers, Inc. v. President of India*, 446 F.2d 1198
    (2d Cir. 1971)......................................................................................23

*In re Maxwell Commc'n Corp. PLC by Homan*,
    93 F.3d 1036 (2d Cir. 1996) .........................................................15

*\*Millen Indus., Inc. v. Coordination Council for N. Am. Affairs*,
    855 F.2d 879 (D.C. Cir. 1988)...............................................13, 18

*\*Mujica v. AirScan Inc.*, 771 F.3d 580 (9th Cir. 2014) ...............................15, 16, 17

*Philipp v. Federal Republic of Germany*,
    248 F. Supp. 3d 59 (D.D.C. 2017).................................................20

*Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36
    (D.C. Cir. 2000) ..............................................................................24

_____

\* Authorities chiefly relied upon are marked with an asterisk

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981)...................................................25

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82
    (D.C. Cir. 2002) ....................................................................................12, 18

*Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.*,
    760 F.2d 390 (2d Cir. 1985) ...........................................................12, 18, 26

*Republic of Austria v. Altmann*, 541 U.S. 677 (2004) ...........................................17

*Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008) ................................8, 16

*Scalin v. Societe Nationale des Chemins de Fer Francais*, No. 15-cv-3362
    (N.D. Ill. Mar. 26, 2018)..................................................................................19

*Segni v. Commercial Office of Spain*, 816 F.2d 344, 347 (7th Cir. 1987)..............24

*Simon v. Republic of Hungary*, 812 F.3d 127
    (D.C. Cir. 2016) ...................................................................4, 5, 6, 7, 14, 22

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
    549 U.S. 422 (2007).........................................................................................26

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).....................................................17

*Stephen v. Zivnostenska Banka Nat'l Corp.*, 15 A.D.2d 111
    (N.Y. App. Div. 1961), *aff'd*, 186 N.E.2d 676 (N.Y. 1962) ........................23

*Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227
    (11th Cir. 2004) .......................................................................................15, 17

*United States v. Nippon Paper Indus. Co.*, 109 F.3d 1 (1st Cir. 1997) ..................15

*Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983) ....................12, 27

_____

\* Authorities chiefly relied upon are marked with an asterisk

### *Constitution, Treaties & Statutes*

Agreement between the Government of the United States of American and the
    Government of the Hungarian People's Republic Regarding the Settlement
    of Claims, art. 2, Mar. 6, 1973, 24 U.S.T. 522 ...............................................10


Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602 *et seq.*...................1, 2
    28 U.S.C. § 1330(b)...............................................................................2
    28 U.S.C. § 1604....................................................................................4, 5
    28 U.S.C. § 1605(a)(3) ................................... 2, 3, 5, 6, 14, 15, 17, 18, 21, 22
    28 U.S.C. § 1605A(a)(2)(A)(iii)..................................................................21

### *Legislative History*

H.R. Rep. No. 94-1487 (1976)........................................................................22, 24

### *Miscellaneous*

Richard B. Lillich, *The United States-Hungarian Claims Agreement of 1973,* 69
    Am. J. Int'l L. 534 (1975)..............................................................................10


Statement of Interest of the United States, *Scalin v. Societe Nationale*
    *Des Chemins de Fer Francais*, No. 15-cv-3362
    (N.D. Ill. Dec. 18, 2015) ................................................................................19


U.S. Amicus Br., *Kingdom of Spain v. Cassirer*, No. 10-786
    (S. Ct. May 27, 2011) ................................................................................20, 21


U.S. Amicus Br. Supporting Panel Reh'g or Reh'g En Banc,
    *Sarei v. Rio Tinto, PLC*, Nos. 02-56256 & -56390 (9th Cir. 2006) ..............16

_____

\* Authorities chiefly relied upon are marked with an asterisk

# GLOSSARY

| | |
|---|---|
| FSIA | Foreign Sovereign Immunities Act |
| JA | Joint Appendix |
| MAV | Magyar Allamvasutak Zrt. |

## INTEREST OF AMICUS CURIAE

The United States submits this amicus brief at the invitation of the Court. Plaintiffs have appealed the district court's ruling dismissing their claims on the basis of international comity and forum non conveniens. The United States has a substantial interest in the proper interpretation and application of those doctrines, which serve to protect the foreign policy interests of the United States and the legitimate interests of foreign states, as well as the interests of private litigants and the U.S. judiciary. U.S. courts' application of the doctrines of international comity and forum non conveniens can also have an impact on the treatment of the United States in foreign courts, under principles of reciprocity. Although the United States does not take a position on the specific application of those doctrines to the facts of this case, in the view of the United States, both doctrines can properly be applied in appropriate circumstances to dismiss claims brought under the expropriation exception to immunity in the Foreign Sovereign Immunities Act (FSIA).

## STATEMENT OF THE ISSUES

1. Whether a district court may properly dismiss an action brought under the FSIA's expropriation exception on the ground of international comity, based on the availability of a foreign forum in which the claims could be adjudicated?

2.  Whether a district court may properly dismiss an action against a foreign state and its instrumentality on the ground of forum non conveniens, based on the availability of a foreign forum in which the claims could be adjudicated?

## PERTINENT STATUTES AND REGULATIONS

Under the FSIA, 28 U.S.C. §§ 1330, 1602 *et seq.*, a foreign state is immune from the jurisdiction of U.S. courts except as provided by the statutory exceptions to immunity.  Section 1605(a)(3) provides that immunity does not apply in any case

> in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction" under the FSIA's exceptions to foreign sovereign immunity, where service has been made in compliance with the FSIA.  28 U.S.C. § 1330(b).

## STATEMENT OF FACTS

A.  **FACTUAL BACKGROUND**

This putative class action was brought by a group of Holocaust survivors who were Hungarian nationals and residents during World War II.  The operative

2

complaint brings claims against the Republic of Hungary and the state-owned

Hungarian railway—Magyar Allamvasutak Zrt. (MAV)—for their role in

confiscating the personal property of Hungarian Jews and transporting Hungarian

Jews to ghettos and to concentration and slave-labor camps in Nazi-controlled

territory, where they were tortured and murdered.  The plaintiffs allege that their

property was confiscated by officials of the Hungarian government and employees

of MAV, and that they never received compensation for the seized property or the

return of the property.

Plaintiffs allege that the defendants are subject to jurisdiction under the

FSIA's "expropriation exception" to foreign sovereign immunity, 28 U.S.C.

§ 1605(a)(3).  Plaintiffs allege that "[d]efendants own and/or operate property that

they stole from Hungarian Jewish deportees during the Holocaust, or property

exchanged for such stolen property," and that "[d]efendants liquidated stolen

property, mixed the resulting funds with their general revenues, and devoted the

proceeds to funding various governmental and commercial operations."  Second

Am. Compl., Dkt. 118, at 26.  Plaintiffs also allege that the expropriated property

or property exchanged for such property "is owned and operated by Hungary and

MAV and/or other agencies and instrumentalities of Hungary that are engaged in

commercial activity in the United States," and that "[s]ome of the stolen property,

or property exchanged for such property, is present in the United States in

3

connection with commercial activity carried on in the United States by Hungary."

*Id.*

Plaintiffs allege that the seizure of their property "violated customary international and treaty law actionable in [U.S. court] as federal law and the law of nations." Second Am. Compl., Dkt. 118, at 25, 50. They also allege claims for unjust enrichment, breach of fiduciary duties of a common carrier, recklessness, negligence, civil conspiracy to commit tortious acts, aiding and abetting, restitution, and accounting. *Id.* at 50-55.[1]

## B.    PROCEDURAL BACKGROUND.

**1.** The district court previously dismissed the claims against the defendants for lack of subject matter jurisdiction under the FSIA under 28 U.S.C. § 1604, which provides that, "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune" from jurisdiction in U.S. court "except as provided in sections 1605 to 1607 of this chapter." On appeal, this Court reversed and remanded. *Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016).

---

[1] Plaintiffs also originally brought claims against Rail Cargo Hungaria Zrt. First Am. Compl., Dkt. 21, at 24, 49-59. Those claims were dismissed for lack of personal jurisdiction, and are not at issue here. *See Simon v. Republic of Hungary*, 812 F.3d 127, 134 (D.C. Cir. 2016).

4

This Court reasoned that the 1947 Peace Treaty between Hungary and the Allied Powers (including the United States), which the district court relied on to rule that it lacked subject matter jurisdiction, "secures an obligation by Hungary to provide compensation for property interests confiscated from Hungarian Jews during" World War II, but held that this treaty right to compensation is not exclusive and that the treaty does not bar a court's exercise of jurisdiction under § 1604. *Simon*, 812 F.3d at 132, 136-40.

The Court further held that, under the FSIA's expropriation exception, § 1605(a)(3), plaintiffs have alleged that their property was "taken in violation of international law." *Simon*, 812 F.3d at 132, 141-49. The Court reasoned that plaintiffs alleged the taking of their property "in the commission of genocide against Hungarian Jews." *Id.* The Court held that "[b]ecause those expropriations themselves amount to genocide, they qualify as takings of property 'in violation of international law.'" *Id.* at 132; *accord id.* at 142-43.

The Court then considered whether plaintiffs sufficiently pled the commercial-activity nexus requirements in the expropriation exception. *Simon*, 812 F.3d at 146-47. The Court reasoned that allegations "that the Hungarian defendants liquidated the stolen property, mixed the resulting funds with their general revenues, and devoted the proceeds to funding various governmental and commercial operations" raised a plausible inference that "the defendants retain the

5

property or the proceeds thereof," and that the defendants have not "demonstrate[d] conclusively that the value of the expropriated property is not traceable to their present day cash and other holdings." *Id.* at 147. The Court also reasoned that the allegations that MAV maintains a ticket agency in the United States, books reservations, and engages in similar business in the United States were sufficient to establish that MAV "is engaged in a commercial activity in the United States" under § 1605(a)(3).

The Court held, however, that the "bare, conclusory assertion" in the First Amended Complaint as to the nexus between expropriated property and commercial activity carried on by Hungary within the United States failed to establish § 1605(a)(3)'s commercial-activity nexus requirement as to Hungary, which requires that plaintiffs establish that the expropriated property or property exchanged for such property "is present in the United States in connection with a commercial activity carried on in the United States by the foreign state." *Simon*, 812 F.3d at 147-48. The Court left to the district court on remand the decision whether to allow plaintiffs to amend their complaint to address the inadequacy of their allegations about Hungary's commercial activity in the United States and its connection to expropriated property. *Id.* at 148.

Finally, the Court considered defendants' arguments that "there can be no jurisdiction under § 1605(a)(3) unless the plaintiffs first demonstrate that they have

exhausted available domestic remedies in Hungary." *Simon*, 812 F.3d at 148.  The Court noted that "the FSIA itself imposes no exhaustion requirement," and also that the plaintiffs' alleged international-law violation of genocidal taking did not require any showing that compensation was not available through local remedies. *Id.* at 148-49.  The Court left it to "the district court to consider on remand whether, as a matter of international comity, the plaintiffs must first exhaust available remedies in Hungary before proceeding with their claims in United States courts."  *Id.* at 132-33, 149.  The Court also left to the district court on remand consideration of defendants' forum non conveniens arguments.  *Id.* at 151.[2]

**2.**  On remand, after allowing plaintiffs to file a second amended complaint, the district court dismissed plaintiffs' claims.  The district court recognized that defendants argued that the case should be dismissed with prejudice for lack of subject matter jurisdiction because plaintiffs' second amended complaint failed to establish the commercial activity nexus in the FSIA's expropriation exception. Mem. Op., Dkt. 132, at 10 & n.6.  The district court declined to reach that argument, however, because it concluded that dismissal without prejudice was warranted based on threshold grounds of forum non conveniens and international comity.

---

[2] The Court also held that the case did not present a non-justiciable political question based on the record before it.  *Simon*, 812 F.3d at 149.

The district court first considered whether to decline to exercise jurisdiction as a matter of international comity until the plaintiffs exhaust domestic remedies in Hungary. The court noted that the forum non conveniens doctrine applies to FSIA cases "despite lacking a statutory basis," and pointed to "the similarity between the prudential exhaustion doctrine and the *forum non conveniens* doctrine" in concluding that "the FSIA is not a bar to adopting prudential exhaustion in this case." Mem. Op., Dkt. 132, at 16. The court also reasoned that international comity considerations are implicated when a suit in U.S. court is brought against a foreign sovereign, rather than a private defendant, and the claims "arise from events of historical and political significance" to the foreign state. *Id.* at 18 (quoting in part *Republic of Philippines v. Pimentel*, 553 U.S. 851, 866 (2008)). Weighing various case-specific factors and concerns, the district court concluded that

> [i]nternational comity concerns apply here and warrant dismissal, without prejudice, of the Second Amended Complaint for failure to exhaust the remedies available in Hungary to address the plaintiffs' claims of genocidal takings during World War II, under the prudential exhaustion doctrine.

Mem. Op., Dkt. 132, at 27.

For similar reasons, the district court held that the case is properly dismissed on forum non conveniens grounds. The court emphasized that ten of the fourteen plaintiffs are not U.S. citizens or residents, and that "none of the underlying facts

8

in this case relate to the United States in any way." Mem. Op., Dkt. 132, at 29-30.

The court also recognized Hungary's interest in resolving a dispute involving the

Hungarian government's wrongdoing against Hungarians in Hungary, as well as

the interest in having a Hungarian court potentially interpret Hungarian law,

including constitutional law. *Id.* at 34-35. On balance, the district court held, the

relevant factors weigh "in favor of Hungary as the more appropriate forum for this

lawsuit." *Id.* at 36.

Plaintiffs appealed. On April 20, 2018, following oral argument in this case,

the Court invited the views of the United States as amicus curiae.

## ARGUMENT

### A DISTRICT COURT MAY DISMISS CLAIMS UNDER THE FSIA'S EXPROPRIATION EXCEPTION IN DEFERENCE TO AN ALTERNATIVE FORUM UNDER THE DOCTRINES OF INTERNATIONAL COMITY AND FORUM NON CONVENIENS

The United States deplores the acts of violence that were committed against

plaintiffs and their family members, and supports efforts to provide them with a

remedy for the wrongs they suffered. The policy of the United States Government

with regard to claims for restitution or compensation by Holocaust survivors and

other victims of the Nazi era has consistently been motivated by the twin concerns

of justice and urgency. No amount of money could provide compensation for the

suffering that the victims of Nazi-era atrocities endured. Nevertheless, the moral

imperative has been and continues to be to provide some measure of justice to the

victims of the Holocaust, and to do so in their remaining lifetimes. The United States has advocated that concerned parties, foreign governments, and non-governmental organizations act to resolve matters of Holocaust-era restitution and compensation through dialogue, negotiation, and cooperation, rather than subject victims and their families to the prolonged uncertainty and delay that accompany litigation.

With respect to Hungary specifically, the 1947 Peace Treaty between Hungary and the Allied Powers (including the United States) contained provisions in Articles 26 and 27 addressing property claims of non-Hungarian and Hungarian nationals. In 1973, the United States reached a claims settlement agreement with Hungary, in which the United States accepted $18.9 million in settlement of claims relating to Hungary's obligations under Articles 26 and 27 of the 1947 Peace Treaty, as well as certain other claims against Hungary.[3] That settlement, however, only resolved individual claims for individuals who were U.S. nationals at the time their claims arose, and hence does not apply to the claims of the named plaintiffs here. More broadly, while the United States continues to advocate for the Hungarian government to resolve remaining Holocaust-era restitution issues, the

---

[3] Agreement between the Government of the United States of America and the Government of the Hungarian People's Republic Regarding the Settlement of Claims, art. 2, Mar. 6, 1973, 24 U.S.T. 522; *see also* Richard B. Lillich, *The United States-Hungarian Claims Agreement of 1973,* 69 Am. J. Int'l L. 534 (1975).

United States has not had specific substantive involvement in efforts to address the types of property-related claims that are at issue in this case.

Thus, in contrast to the United States' involvement in the establishment of certain Holocaust claims processes in a number of other European countries, such as Germany, Austria, and France, the United States has not participated in efforts of the Republic of Hungary toward establishing a claims mechanism for the Holocaust victims whose claims are at issue in this case and were not resolved by the prior settlement agreements. Nor does the United States have a working understanding of the mechanisms that have been or continue to be available in Hungary with respect to such claims. Accordingly, the United States does not express a view as to whether it would be in the foreign policy interests of the United States for plaintiffs to have sought or now seek compensation in Hungary. The United States therefore takes no position on the particular facts and circumstances of this case as to whether the district court properly applied the doctrines of prudential exhaustion and forum non conveniens to dismiss plaintiffs' claims in favor of litigation in Hungarian courts.

The United States files this brief as amicus curiae, however, in response to the Court's invitation and to express its view that the doctrines of forum non conveniens and international comity can, in an appropriate case, be grounds for dismissal of claims brought against a foreign state or its agency or instrumentality

11

under the FSIA's expropriation exception.  Plaintiffs cite federal courts' "virtually unflagging obligation" to exercise their jurisdiction, Appellants Br. 29, but that principle does not require U.S. courts to adjudicate claims in circumstances where, for example, such litigation would be at odds with the foreign policy interests of the United States and the sovereign interests of a foreign government.

It is well-established—and plaintiffs themselves acknowledge, Appellants Br. 32—that claims over which a district court has subject matter jurisdiction under the FSIA may be dismissed on the ground of forum non conveniens.  *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 490 n.15 (1983) ("The [FSIA] does not appear to affect the traditional doctrine of *forum non conveniens*."); *see also, e.g.*, *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 100 (D.C. Cir. 2002) ("[T]he doctrine of *forum non conveniens* remains fully applicable in FSIA cases."); *Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.*, 760 F.2d 390, 394 (2d Cir. 1985) (same).  Plaintiffs assert that the availability of forum non conveniens makes it unnecessary to apply a doctrine of international comity in appropriate cases, but their argument ignores the critical interests served by comity.

Forum non conveniens applies even in cases involving purely private parties, if the balancing of interests supports resolution of the dispute in a foreign court. International comity is relevant in cases that implicate more significant sovereign

12

interests, by discouraging a U.S. court from second-guessing a foreign government's judicial or administrative resolution of a dispute (or provision for resolution), or otherwise sitting in judgment of the official acts of a foreign government. *See generally Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895). And despite Congress' enactment of the FSIA to govern foreign sovereign immunity, "the foreign policy implications of the application of that Act obviously occasion a continuing involvement by the Executive" in identifying circumstances in which sovereign interests support application of comity principles. *Millen Indus., Inc. v. Coordination Council for N. Am. Affairs*, 855 F.2d 879, 881-82 (D.C. Cir. 1988) (act of state doctrine).

In an appropriate case, and as we explain further below, foreign policy and foreign sovereign interests can support a court's decision to defer to an alternative foreign forum rather than to exercise jurisdiction over claims under the FSIA's expropriation exception. Judicial deference to the Executive's expressed view of the potential impact of litigation on our foreign affairs under a comity analysis derives from "the primacy of the Executive in the conduct of foreign relations." *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 767 (1972) (plurality op.) (cited with approval in *Millen Indus.*, 855 F.2d at 881). Given the long pendency of this action and the significant questions as to the court's subject matter jurisdiction, however, it would have been advisable in this case for the

13

district court to resolve the question of its jurisdiction under the FSIA before

dismissing the case on prudential exhaustion grounds that the district court

suggested would permit plaintiffs to return to U.S. courts.

A.    **A District Court May Dismiss A Case Brought Under The FSIA's Expropriation Exception In Deference To An Alternative Forum As A Matter Of International Comity.**

In the view of the United States, a district court may dismiss an action

brought under the FSIA's expropriation exception in deference to an alternative

available forum as a matter of international comity.  Although exhaustion is not

mandatory in this context under international or domestic law,[4] it is an available

doctrinal basis for declining to exercise jurisdiction in an appropriate case, where

consideration of the interests of the United States and the foreign state weighs

sufficiently in favor of an adequate alternative forum.  Dismissal on international

comity grounds can play a critical role in ensuring that litigation in U.S. courts

does not conflict with or cause harm to the foreign policy of the United States,

such as in circumstances where U.S. foreign policy is to channel disputes to an

alternative forum.  The fact the FSIA itself does not impose any exhaustion

---

[4] *See Simon,* 812 F.3d at 148-49 (explaining that the statute itself does not require exhaustion and that the case does not involve a "standard expropriation" claim for a non-discriminatory taking for a public purpose, where it may be necessary for the plaintiff to have pursued and been denied compensation for there to be a violation of international law).

14

requirement for expropriation claims under § 1605(a)(3) does not foreclose dismissal on international comity grounds.

"International comity is a doctrine of prudential abstention, one that 'counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law.'" *Mujica v. AirScan Inc.*, 771 F.3d 580, 598 (9th Cir. 2014) (quoting *United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 8 (1st Cir. 1997)).  One strain of the doctrine, adjudicatory comity, applies when one country's court declines "to exercise jurisdiction in a case properly adjudicated in a foreign state." *Mujica*, 771 F.3d at 599 (quoting *In re Maxwell Commc'n Corp. PLC by Homan*, 93 F.3d 1036, 1047 (2d Cir. 1996)).

In deciding whether to decline to exercise jurisdiction on adjudicatory comity grounds in deference to a foreign forum, a U.S. court "evaluate[s] several factors, including the strength of the United States' interest in using a foreign forum, the strength of the foreign governments' interests, and the adequacy of the alternative forum." *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004).  The Ninth Circuit, elaborating on those factors in *Mujica*, set out a non-exclusive list of considerations in applying the doctrine of international comity.  The Court explained that relevant factors to be considered in assessing U.S. interests included "(1) the location of the conduct in question, (2) the

15

nationality of the parties, (3) the character of the conduct in question, (4) the

foreign policy interests of the United States, and (5) any public policy interests."

*Mujica*, 771 F.3d at 604.

Comity is closely tied to territoriality, and a court should give less weight to

U.S. interests where the activity at issue occurred in a foreign country and involved

harms to foreign nationals.  Conversely, the analysis of foreign interests, which

"essentially mirrors the consideration of U.S. interests," gives weight to a foreign

state's "interests in regulating conduct that occurs within their borders" and

"involves their nationals."  *Mujica*, 771 F.3d at 607; *see also, e.g.*, *Republic of

Philippines*, 553 U.S. at 866 (recognizing that a foreign state has "a unique

interest" in resolving in its own courts a dispute involving claims arising from

"events of historical and political significance for [that state] and its people"); *cf.*

U.S. Amicus Br. Supporting Panel Reh'g or Reh'g En Banc, at 27-28, *Sarei v. Rio

Tinto, PLC*, Nos. 02-56256 & -56390 (9th Cir. 2006) ("To reject a principle of

exhaustion and to proceed to resolve a dispute arising in another country, centered

upon a foreign government's treatment of its own citizens, when a competent

foreign court is ready and able to resolve the dispute, is the opposite of the model

of 'judicial caution' and restraint contemplated by" *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)).[5]

One critical factor to be considered in determining whether to dismiss on international comity grounds is the foreign policy interests of the United States. In circumstances in which the United States has expressed its foreign policy interests in connection with a particular subject matter or litigation, a court should give substantial weight to the United States' views that those interests support (or weigh against) abstention in favor of a foreign forum that can resolve the dispute. *See Ungaro-Benages*, 379 F.3d at 1236, 1239; *Mujica*, 771 F.3d at 609-10 (giving serious weight to United States' statement that foreign policy interests support dismissal on international comity grounds); *cf. Republic of Austria v. Altmann*, 541 U.S. 677, 701-02 (2004) (recognizing that, where the State Department has suggested that the court should decline to exercise jurisdiction "over *particular* petitioners in connection with *their* alleged conduct, that opinion might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy" (footnote omitted)). Dismissal on international comity grounds can ensure that litigation in U.S. courts does not cause substantial harm to

---

[5] Although the claims in *Sosa* were brought under the Alien Tort Statute, rather than the FSIA, the FSIA's expropriation exception requires U.S. courts to determine as a jurisdictional matter that a foreign state has violated international law, and, depending on the issues in dispute, can raise similar comity concerns.

our foreign relations or otherwise conflict with federal foreign policy. *Cf.*
*American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413-20 (2003).

Finally, while the district court did not resolve the outstanding questions
relating to its subject matter jurisdiction in this case, we note that the fact a district
court has jurisdiction under the FSIA's expropriation exception does not foreclose
dismissal on the grounds of international comity. International comity, like forum
non conveniens, is a federal common-law doctrine of abstention in deference to an
alternative forum. Nothing in the text or history of the FSIA suggests that it was
intended to foreclose application of those doctrines, or to require a court to
exercise jurisdiction in every case. *See Price*, 294 F.3d at 100; *Proyecfin de
Venezuela*, 760 F.2d at 394; *see also Millen Indus.*, 855 F.2d at 881-82
(recognizing with approval the "continuing involvement by the Executive" in cases
brought under the FSIA); *cf. Agudas Chasidei Chabad of U.S. v. Russian Fed'n*,
528 F.3d 934, 950-51 (D.C. Cir. 2008) (reviewing the merits of the district court's
refusal to dismiss expropriation claim on forum non conveniens grounds).

Nor, contrary to plaintiffs' arguments, are all relevant considerations relating
to international comity incorporated in the terms of the FSIA's expropriation
exception. In appropriate, case-specific circumstances, dismissal on the basis of
international comity may be appropriate in claims over which a court has
jurisdiction under § 1605(a)(3). In *Scalin v. Societe Nationale des Chemins de Fer*

18

*Francais*, No. 15-cv-3362 (N.D. Ill.), for example, the United States supported

dismissal of an action filed by Holocaust victims against the French national

railroad not only on jurisdictional grounds but also on grounds of, *inter alia*,

international comity.  *See* Statement of Interest of the United States, Dkt. 63 (Dec.

18, 2015).  The United States explained that the U.S. Government had supported

the French government's efforts to compensate Holocaust victims and their

families, including France's development of an administrative compensation

scheme for certain property-related claims of nationals of any country as well as an

Executive Agreement between France and the United States that expanded a

French pension program for surviving Holocaust deportees and surviving spouses

of deportees to cover U.S. citizens and other foreign nationals not previously

eligible to receive compensation.  The United States explained that it would be in

the interests of the United States and France to resolve the plaintiffs' Holocaust-

related claims through the commission and programs established by France rather

than through litigation in U.S. courts.  The United States urged international

comity as an independent justification for dismissing the action in deference to the

French compensation schemes, and the district court agreed.  Mem. Op., Dkt. 83,

*Scalin v. Societe Nationale des Chemins de Fer Francais*, No. 15-cv-3362 (N.D.

Ill. Mar. 26, 2018).  The case-specific considerations supporting dismissal in that

case are not factors that are incorporated into the elements of the FSIA's expropriation exception.

In arguing that the district court erred in recognizing a doctrine of international comity, plaintiffs rely on two district court cases rejecting prudential exhaustion in cases brought under the FSIA's expropriation exception. Appellants Br. 22 (citing *de Csepel v. Republic of Hungary*, 169 F. Supp. 3d 143, 169 (D.D.C. 2016), and *Philipp v. Federal Republic of Germany*, 248 F. Supp. 3d 59, 82-83 (D.D.C. 2017)). Those courts, however, viewed the doctrine of prudential exhaustion recognized by the Seventh Circuit in *Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847 (7th Cir. 2015), as being based solely on an international-law rule. As the district court here correctly recognized, *Fischer* can properly be understood to refer to international-law practice not in order to require exhaustion as a binding norm of international law, but by analogy to infer a broader principle of international comity supporting abstention under domestic law. Mem. Op., Dkt. 132, at 16-17.

Indeed, the fact that the defendant in a case brought under the FSIA's expropriation exception is a foreign state may itself be a valid consideration in an international comity analysis, as a suit brought directly against a foreign state can cause more international friction than a suit brought against a state-owned commercial entity. *See* U.S. Amicus Br., at 15-16, *Kingdom of Spain v. Cassirer*,

20

No. 10-786 (S. Ct. May 27, 2011) (noting that, where a foreign state itself is not a defendant in an action under the FSIA's expropriation exception, the potential foreign relations impact of a suit may be significantly diminished).  The FSIA's expropriation exception is unusual in that it provides jurisdiction in cases involving international-law violations almost always committed in a foreign state rather than the types of purely private-law disputes ordinarily brought under the FSIA's other exceptions to sovereign immunity, where the relevant action or at least the gravamen of the claim took place in the United States (aside from the terrorism exception, which itself requires exhaustion of certain other remedies, 28 U.S.C. § 1605A(a)(2)(A)(iii)).

Where the contacts between foreign state defendants and the United States are attenuated, that may also be a basis for a court to resolve its own subject matter jurisdiction in a particular case before dismissing claims on international comity grounds.  The district court's exhaustion analysis envisioned that plaintiffs could return to U.S. court following litigation in Hungarian courts, and assert the right to pursue claims on the basis that Hungarian remedies were unreasonably withheld. That would extend even further the duration of this litigation, which has already been pending for over seven years.  Mem. Op., Dkt. 132, at 17.

It is far from clear, however, that the district court has jurisdiction under the FSIA's expropriation exception.  The FSIA's exceptions to immunity were

intended by Congress to incorporate "[t]he requirements of minimum jurisdictional contacts" that were generally thought sufficient to support exercise of personal jurisdiction over an out-of-state defendant.  H.R. Rep. No. 94-1487, at 13 (1976). Each of Section 1605(a)'s exceptions to immunity "requires some connection between the lawsuit and the United States, or an express or implied waiver by the foreign state of its immunity from jurisdiction," thereby "prescrib[ing] the necessary contacts which must exist before our courts can exercise personal jurisdiction."  *Id.*  The commercial activity nexus requirement in the FSIA's expropriation exception should, if applied with appropriate rigor, screen out many cases that would raise significant comity concerns.

In order for the Republic of Hungary to be subject to the district court's subject matter jurisdiction, plaintiffs must establish that expropriated property or any property exchanged for such property is "present in the United States in connection with a commercial activity carried on in the United States by the foreign state."  28 U.S.C. § 1605(a)(3).  Only the first clause of § 1605(a)(3) can be the basis for jurisdiction over the foreign state.  *See de Csepel v. Republic of Hungary*, 859 F.3d 1094, 1106-08 (D.C. Cir. 2017).  This Court previously recognized that the allegations in the first amended complaint were insufficient to exercise subject matter jurisdiction over the Republic of Hungary.  *Simon*, 812 F.3d at 148.

22

Requiring a showing that expropriated property or identifiable property exchanged for such property is present in the United States in connection with the foreign state's commercial activity in this country is consistent with the historic backdrop of the FSIA. Prior to the statute's enactment, foreign states enjoyed immunity from suit arising out of the expropriation of property within their own territory, *see, e.g.*, *Isbrandtsen Tankers, Inc. v. President of India*, 446 F.2d 1198, 1200 (2d Cir. 1971), with the possible exception of *in rem* cases in which U.S. courts took jurisdiction to determine rights to property actually situated in the United States. *E.g.*, *Stephen v. Zivnostenska Banka Nat'l Corp.*, 15 A.D.2d 111, 119 (N.Y. App. Div. 1961), *aff'd*, 186 N.E.2d 676 (N.Y. 1962). In enacting the FSIA and creating for the first time an exception to the *in personam* immunity of a foreign state in certain expropriation cases, Congress adopted an incremental approach that paralleled those few cases in which title to property in the United States had been in issue. In contrast, deeming allegations that the Republic of Hungary seized and liquidated property abroad and commingled it with general revenues in its treasury abroad many decades ago to be sufficient to treat any state-owned property in the United States as "exchanged" for expropriated property would expand the expropriation exception far beyond its intended limits—limits that were also intended to ensure that any exercise of personal jurisdiction over a

23

foreign state defendant would satisfy minimum contacts requirements. *See* H.R. Rep. No. 94-1487, at 13-14.

Similar concerns are raised by application of a rationale that allegations that a foreign state agency or instrumentality has historically commingled the proceeds of seized and liquidated assets among its assets are sufficient to establish jurisdiction over the agency or instrumentality if it does unrelated business in the United States.

Particularly in light of the underlying purposes of foreign sovereign immunity, it would have been preferable for the district court to resolve its jurisdiction over defendants before dismissing plaintiffs' claims without prejudice on grounds that might not end definitively the litigation in U.S. courts. *Cf. Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000) (recognizing that foreign sovereign immunity protects the foreign state from "trial and the attendant burdens of litigation," not simply "liability on the merits"); *Segni v. Commercial Office of Spain*, 816 F.2d 344, 347 (7th Cir. 1987) ("A foreign government should not be put to the expense of defending what may be a protracted lawsuit without an opportunity to obtain an authoritative determination of its amenability to suit at the earliest possible opportunity.").

### B.   A District Court May Also Abstain From Exercising Jurisdiction Under The FSIA Under The Forum Non Conveniens Doctrine.

For similar reasons, although the United States does not take a position an application of forum non conveniens to the particular facts and circumstances of this case, it is clear that a district court may decline to adjudicate claims on that basis even where it has or may have subject matter jurisdiction under the FSIA. Under the forum non conveniens doctrine, relevant considerations include a range of public and private factors, *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981), including the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; and other practical problems relating to trial of the case; administrative burdens on a court; and the court's familiarity with the law to be applied.  *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947).  The public interest factors can also include considerations of the foreign relations consequences of adjudication for the United States and the foreign government. *See Esfeld v. Costa Crociere, S.P.A.*, 289 F.3d 1300, 1312-13 (11th Cir. 2002). Indeed, because the applicable legal standard for the forum non conveniens doctrine is so well established and there is a sizable body of law in which the standard is applied—unlike in the international comity context—it may be advisable for a district court to address forum non conveniens first before reaching the question of international comity.

Furthermore, forum non conveniens can play an additional, and critical, role in a case brought against a foreign state defendant. The inquiry into jurisdiction under the FSIA can often be time-consuming and difficult. As the Supreme Court recognized in *Verlinden*, a court's application of forum non conveniens can help to identify and resolve at the threshold stage cases with only a weak nexus to the United States. 461 U.S. at 490 n.15; *see also, e.g.*, *Proyecfin,* 760 F.2d at 394 (reasoning that forum non conveniens will help prevent U.S. courts from becoming "international courts of claims" for "local disputes between foreign plaintiffs and foreign sovereign defendants). Application of the forum non conveniens doctrine can assist in identifying cases in which an alternative foreign forum has a closer connection to the underlying parties and/or dispute, thereby avoiding years of litigation over jurisdictional issues, potentially involving intrusive jurisdictional discovery, which can impose substantial burdens on foreign states. *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, (2007) (a district court "may dispose of an action by a *forum non conveniens* dismissal, bypassing questions of subject matter and personal jurisdiction, when considerations of convenience, fairness, and judicial economy so warrant.").

Respectfully submitted,

JENNIFER G. NEWSTEAD                    CHAD A. READLER
  *Legal Adviser*                         *Acting Assistant Attorney General*

  *U.S. Department of State*             MARK B. STERN
  *Washington, D.C.  20520*             /s/ Sharon Swingle
                                        SHARON SWINGLE
                                          *(202) 353-2689*
                                          *Attorneys, Appellate Staff*
                                          *Civil Division, Room 7250*
                                          *U.S. Department of Justice*
                                          *950 Pennsylvania Ave., N.W.*
                                          *Washington, D.C.  20530*

JUNE 2018

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and this Court's 20, 2018 order because it contains 6,006 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

 /s/ Sharon Swingle
SHARON SWINGLE

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2018, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

 /s/ Sharon Swingle
SHARON SWINGLE